IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

RAMON HENDERSON, )
)
Plaintiff, )
)
v. ) CIVIL ACTION NO. 1:08CV78-SRW
) (WO)
MICHAEL J. ASTRUE, Commissioner )
of Social Security, )
)
Defendant. )

**MEMORANDUM OF OPINION**

Plaintiff Ramon Henderson brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his applications for child disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed.

**BACKGROUND**

Plaintiff alleges a disability onset date of April 1, 1999, but provided no documentation of medical treatment before July 2004. (See Exhibit 1F, R. 103, 105)(treatment for conjunctivitis in July 2004 and upper respiratory infection in September 2004). In July 2005, just over a month before he filed the present applications, plaintiff visited his pediatrician, seeking a referral to "Dr. West." Dr. Head's note for plaintiff's July

1, 2005 visit states,

> [H]e needs a referral to Dr. West. He has bipolar disease. He has had problems with oppositional behavior in the past and ADHD and is being treated with Prozac 40 mg. and in the morning and Strattera by Dr. West and needs a referral back to Dr. West. His exam is otherwise normal. He has had no major health problems. We talked a little bit about his goal. He is musically oriented. He has got his GED. He was locked up for about 9 months when he thought it was going to be 6 weeks and learned patience and doesn't [lose] his temper anymore. He says it was much more [e]ffective than the medicines. It sounds like his attitude has greatly improved. He wants to go to college and produce things like records and so I strongly encouraged continuing education and goals.

(R. 104).

On July 7, 2005, plaintiff reported to a psychiatrist, Dr. Chris Strunk, for an evaluation. Dr. Strunk noted plaintiff's history as follows:

> He has been treated for ADHD by Dr West for quite some time with Prozac and Strattera Dr West tried him on Adderall in the past but this "flipped him out and he became even more violent Most recently, he slugged a cop in some sort of a youth dance club and he has active charges pending from this He states that he used to smoke marijuana and he is able to contribute this somewhat to his violent behavior His mother states that his moods are extremely volatile and he goes three to four days without sleep and then crash sleeps He is either "very up or very down" and does not seem to have any moods in between No evidence that he has been grandiose to the point of psychosis He does tend to get himself into trouble and has also been quite amorous with young women and this has further complicated his social environment Today he reports depressive themes, including diminished sense of self-esteem and anhedonia

(R. 136). Dr. Strunk's assessment was "Bipolar Type II Disorder," "Rule-out Bipolar Type I Disorder," and "Attention-Deficit Hyperactivity Disorder." (R. 137). He stated, "Unable to discern if patient is Bipolar Type I versus Type II at present time but he is certainly experiencing a significant degree of mood volatility that I feel requires medical

management." (Id.). Dr. Strunk decreased plaintiff's prescription for Prozac, continued his prescribed Strattera, and started him on Tegretol. (Id.).

Plaintiff returned to Dr. Strunk on July 31, 2005. Dr. Strunk's notes state:

> **Subjective:** This 18 year old male presents today for psychiatric evaluation. Ramon has done better since staring the Tegretol in terms of anger, but continues to exhibit significant volatility in terms of mood. His sleep cycle remains erratic, and he continues to have difficulty thinking through complex problems.
>
> **Objective:** Patient is a 18 year old male who appears pleasant. Speech is pressured. Thought process is increased speed. Patient does not exhibit abnormal or psychotic thoughts. Patient judgment and insight is fair. Oriented to person, place and time. Recent and remote memory is intact; patient recalls 3 out of 3 objects at 5 and 10 minutes. Attention span and concentration is remains easily distracted and hypervigilant. Mood and affect appear labile.

(R. 135). Dr. Strunk's assessment was "Attention deficit disorder with hyperactivity," and "Bipolar 1 disorder, most recent episode (or current) mixed." He stated, "Patient appears to have made a transition from ADHD type symptoms to frank bipolar disorder in adulthood." Dr. Strunk renewed plaintiff's Tegretol prescription, reduced his Prozac prescription, and continued his Strattera. (Id.).

On August 10, 2005, plaintiff filed applications for child disability benefits under the earnings of his father and for supplemental security income. On October 20, 2005, psychologist Walter Jacobs, Ph.D., performed a consultative examination. Plaintiff reported that he had previously been treated for ADHD by Dr. Handal and Dr. West, but was then being treated by Dr. Strunk. He also reported that he had assaulted a police officer in a teen club and was found in possession of marijuana, that he did three months of community service at Dale County Rescue Mission and worked at a McDonald's during the summer, and

that he had dropped out of school after eighth grade but had obtained his GED. When Dr. Jacobs asked plaintiff why he believed that he was not able to work, he responded, "I can work. I just ain't got a job right now." Dr. Jacobs observed that a review of Dr. Strunk's notes "indicates that he believes that Ramon is evolving into a bipolar disorder." After evaluating the plaintiff, Dr. Jacobs diagnosed "Mood Disorder NOS" and "Antisocial Personality Disorder." He found plaintiff to be "capable of employment in a wide range of jobs." (Exhibit 2F, R. 106-109).

On November 3, 2005, a non-examining agency psychiatrist – after reviewing Dr. Strunk's notes from his July 2005 evaluation and Dr. Jacobs' notes regarding the October consultative examination – concluded that plaintiff has no limitations in activities of daily living, no episodes of decompensation, and mild limitations in maintaining social functioning and in maintaining concentration, persistence or pace. (Exhibit 3F, R. 110-123).

Dr. Strunk's notes for plaintiff's office visit on November 10, 2005 are identical to those for plaintiff's previous visit three months earlier, except that under "Plan," Dr. Strunk indicated that he discontinued Tegretol, and started plaintiff on Depakote and Remeron. (R. 134).

On May 24, 2006 – more than six months after plaintiff was last evaluated by Dr. Strunk – Dr. Strunk completed a form on which he indicated that plaintiff had "extreme" limitations in his ability to: (1) interact appropriately with the general public; (2) ask simple questions or request assistance; (3) get along with co-workers or peers; (4) understand, remember and carry out simple instructions; (5) maintain attention and concentration for

extended periods; (6) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (7) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) respond appropriately to supervision; (9) respond appropriately to changes in the work setting; (10) respond appropriately to customary work pressures; and (11) be aware of normal hazards and take appropriate precautions. Dr. Strunk indicated that plaintiff had a "marked" degree of: (1) constriction of interests; (2) deterioration in personal habits; (3) impairment of his ability to understand, remember and carry out complex instructions; (4) impairment of his ability to understand, remember and carry out repetitive tasks; (5) impairment of his ability to sustain a routine without special supervision; and (6) impairment of his ability to make simple work-related decisions. Dr. Strunk found the "degree of restriction of the claimant's daily activities, e.g., ability to attend meetings (church, school, lodge, etc.), work around the house, socialize with friends, and neighbors, etc." to be "extreme." Dr. Strunk concluded, "Pt suffers from bipolar disorder. He is compliant with meds, but remains seriously impaired + psychotic as documented above. Pt remains emotionally volatile and hostile. He sleeps poorly + cannot [illegible]." (R. 131-133).

Dr. Strunk evaluated the plaintiff on June 15, July 13, August 10, and October 12, 2006. On each occasion, plaintiff reported doing poorly.[1] Dr. Strunk's objective evaluation

[1] In June, plaintiff reported that he had stopped taking his medications because he could not afford them, that he was "out all night and sleeps during the day," and that he had argued violently with his brother and struck his mother. (R. 188). In July, plaintiff reported that he "remains unable to sleep during the day," that he had attempted to work but his jobs were short-lived because he always argued with his bosses, and

for each of these four visits was as follows:

> Patient is a 19 year old male who appears defiant. Speech is pressured. Thought process is increased speed. Patient exhibits abnormal or psychotic thoughts including delusions and preoccupation with violence. Patient judgment and insight is poor. Oriented to person, place and time. Recent and remote memory is intact; patient recalls 3 out of 3 objects at 5 and 10 minutes. Attention span and concentration is remains easily distracted and hypervigilant. Mood and affect appear labile.

(R. 185, 186, 187, 188). For the first three of the four visits, Dr. Strunk's plan was as follows:

> Renewed Depakote 1000 mg PO QHS DC Remeron 30 mg PO QHS. Started Geodon 60 mg PO nightly. Next visit in one month.

(R. 186, 187, 188). Dr. Strunk's notes for the October visit indicate that he increased plaintiff's dosage of Geodon. Dr. Strunk next evaluated the plaintiff three months later, on January 18, 2007. At that time, he noted that plaintiff was stable on his two medications – Depakote and Remeron – that he was attempting to go back to work, and that he "has had a good deal of difficulty working in the past in terms of his emotional volatility and outbursts." (R. 184).[2]

Dr. Strunk admitted the plaintiff to Southeast Alabama Medical Center on January 22, 2007, after plaintiff reported to Dr. Strunk's office 24 hours after taking ten Depakote pills

---

that he "has again struck a family member, this time his mother." (R. 187). In August, plaintiff indicated that he remained disorganized and was not able to find a job. (R. 186). In October, he appeared wearing a cast because he had punched a wall. He reported that he found it "impossible to sleep at night," that he could not concentrate when he was awake during the day, that he could not control his temper and was worried that he might accidentally harm his pregnant girlfriend. (R. 185).

[2] Dr. Strunk's records also include a medication list dated October 30, 2008 (but provided to plaintiff's counsel by facsimile on March 19, 2007) which indicates that plaintiff was then using Depakote, Prozac, Remeron, Tegratol and two different dosages of Strattera. (R. 183).

in a suicidal gesture, following a fight with his girlfriend. (R. 146). He told Dr. Strunk that he was suicidal. (Id.). Plaintiff was discharged from the hospital on January 24, 2007. The discharge summary states:

> The patient was admitted after suicidal gesture when he states he took ten Depakote. Depakote level was obtained and was found not to be toxic at the time of admit. Although, he stated it had been two days since he had performed this activity. He was observed for 24 hours and voiced no suicidality or homicidality. His liver function tests were within normal limits, and he was thus discharged to outpatient environment.

(R. 144; Exhibit 6F). Plaintiff was to follow up with Dr. Strunk in two weeks. (R. 144).

Plaintiff next saw Dr. Strunk three months later, on March 27, 2007. (Exhibit 8F, R. 189). Dr. Strunk noted that plaintiff was "still sleeping very poorly," and that he had "tried to obtain a job but lost it secondary to his [e]rratic sleep schedule and his mood swings." He continued plaintiff's medications and noted that plaintiff "is continuing to struggle with a good deal despite medication management." (Id.).

On May 17, 2007, after the plaintiff's disability claim was denied at the initial administrative level, an ALJ conducted an administrative hearing. At the hearing, plaintiff testified as follows:

He was then twenty years old and had attended school through the ninth grade, after repeating the first, sixth and ninth grades.[3] He got into trouble at school for not paying attention and for arguing with teachers and principals, and was required to attend alternative school. When asked to describe his daily activity, plaintiff stated, "I wake up. I listen to my morning music. I go outside, find somebody to talk to, walk around come back, eat, drink,

[3] Plaintiff obtained a GED in June 2005. (R. 66).

go back outside, walk some more. I mostly just walk." He has one child, born on January 14, 2007, and is not married to the child's mother. He lives with his brother. His jobs have lasted no longer than a month and a half, and he lost them because he got "into it with somebody at work" or "would forget to show." He had problems with his memory and concentration, depression, and anger outbursts. He sometimes avoided being around people because he could feel his mood switch to "violent." He had problems with his supervisors "nagging" him; when they reminded him to complete work he had forgotten, he would "get mad." His most recent job was at Checkers; plaintiff worked there for two or three weeks, thirty hours per week, but left the job because he misplaced his uniform and could not find it. He lost his job detailing cars at Jackson Car Care after two weeks because his boss said he "wasn't keeping up." He worked forty hours per week at Burger King, but quit after three weeks because he and the manager did not get along. Plaintiff worked forty-eight hours per week for about one month each at two different McDonald's restaurants; he quit his job at the first and was fired from the second because he "got into it with the managers."[4]

Plaintiff sought treatment from Dr. Strunk because of depression spells and outbursts of anger. He "messed up" two of his fingers by punching a wall and a mirror. He was hospitalized a couple of years earlier because he "tried to OD." Plaintiff testified that Dr.

---

[4] In a daily activities questionnaire completed in August 2005, plaintiff provided more detail about his termination from McDonald's. He stated, "I had just started a job at McDonald and I had some [appointments] with my [therapist] (a lot) an[d] they thought I was just asking for time off. I did my work but they didn't like the way I joke an[d] had fun on the job an[d] they let me go." (R. 71). He further reported that he had been offered a job working for three hours a day at the mission, but that his psychiatrist had advised him to "look for more hrs a day so I won[']t get in any trouble because of my condition." (R. 71).

Strunk had changed his medication within the previous couple of months, and that he was doing better on his current medication. The ALJ asked plaintiff what problems, if any, he continued to have while on his current medications; plaintiff responded that the only problem is that, even with medication for sleep, he still does not sleep as long as he is "supposed to," and does not get eight hours of sleep.[5] Plaintiff testified that he continues to see Dr. Strunk once every month or two, and that Dr. Strunk fills plaintiff's medications.[6]

The ALJ rendered a decision on June 1, 2007. He concluded that plaintiff suffered from the severe mental impairment of bipolar disorder and no other severe impairments. (R. 16J).[7] He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On December 20, 2007, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The

---

[5] Plaintiff testified earlier that the medication "works but then it don't work" and that "sometime I'll take my pill like I still get violent." (R. 203).

[6] The records of plaintiff's January 2007 hospital admission also reflect that Dr. Strunk provides plaintiff's medications. (R. 166).

[7] During the hearing, plaintiff's counsel stated that plaintiff has no physical impairments that have been "ongoing for a significant period of time" and plaintiff testified that he has no physical problems. (R. 199, 210).

court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

**DISCUSSION**

The plaintiff challenges the Commissioner's decision, arguing that the ALJ erred by rejecting Dr. Strunk's opinion regarding plaintiff's limitations, finding plaintiff's testimony to be only partially credible, and mischaracterizing the record.

Opinion of Treating Physician

The plaintiff argues that the ALJ erred by rejecting the opinion of his treating psychiatrist, Dr. Strunk. "If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the

record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

The ALJ stated a number of reasons for discounting Dr. Strunk's opinion of plaintiff's functional limitations. The ALJ accurately noted that the form completed by Dr. Strunk is internally inconsistent – Dr. Strunk indicated that plaintiff had an extreme restriction of his ability to understand, remember and carry out *simple* instructions, but a lesser restriction ("marked") in his ability to understand, remember and carry out *complex* instructions. (R. 16G; R. 131, ¶¶ 7, 8). The ALJ further observed that there is no evidence that Dr. Strunk evaluated plaintiff in May 2006, when he completed the form indicating that plaintiff had

either extreme or marked restrictions in all functional areas. (R. 16G; Exhibit 5F). The ALJ also noted that there are no treatment records from Dr. Strunk prior to July 2005 or from November 2005 until Dr. Strunk completed the assessment form in May 2006. (Id.). The reasons articulated by the ALJ are supported by substantial evidence. Additionally, those reasons – most particularly the ALJ's observation that there is no evidence that Dr. Strunk evaluated plaintiff at any time in the six months preceding his completion of the form – provide good cause for declining to give the opinions expressed in the form controlling or determinative weight.[8]

Credibility Determination

The ALJ found plaintiff's testimony to be only partially credible. Citing the Eleventh Circuit's "pain standard," plaintiff contends that the ALJ erred by discounting plaintiff's testimony. In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. The standard requires: "'(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged [symptoms] arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged [symptoms].'" Dyer v. Barnhart, 395

---

[8] According to Dr. Strunk's treatment records for the period between June 2006 and March 2007, plaintiff's condition worsened. However, this does not impeach the ALJ's decision not to give Dr. Strunk's May 2006 opinion determinative weight. Additionally, as the ALJ noted, when plaintiff presented in June 2006, he told Dr. Strunk that he was not then taking his medication. Dr. Strunk subsequently provided plaintiff with medication. (R. 135, 166). As the ALJ further noted, plaintiff testified that he was "better on his current medication regime; and that his only problem now was that he was not sleeping 8 hours." (R. 16H; R. 210).

F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms. Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992). After considering the testimony, the ALJ may reject the claimant's subjective complaints. However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony. Id. "The credibility determination does not need to cite '"'particular phrases or formulations'" but it cannot merely be a broad rejection which is '"not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole."'" Dyer, *supra*, 395 F.3d at 1210 (citations omitted).

The plaintiff argues that the ALJ's credibility determination is inadequate, noting his statement that the plaintiff "has a significant other and has recently become a father, which shows that he does have the capacity to relate with other individuals and form a somewhat meaningful relationship with another person." (Plaintiff's brief, p. 15)(quoting ALJ's decision at R. 16I). Plaintiff argues that his ability to relate to his girlfriend is not an adequate basis for rejecting his subjective testimony regarding his ability to relate to others in a work setting. The court agrees that this reason, standing alone, provides little support for finding plaintiff's testimony to be only partially credible. However, this was not the only reason cited by the ALJ. The first reason given by the ALJ for his credibility determination was plaintiff's report to his physician, Dr. Head, in July 2005 that, after being "locked up" for nine months in a DYS boot camp program, he "learned patience and doesn't [lose] his temper anymore." (R. 16F, 16E; R. 104, 107). Plaintiff told his doctor that the program was

much more effective than medication. He stated that he wanted to go to college and to produce records. Dr. Head noted that plaintiff's attitude appeared to be "greatly improved." (R. 104). The ALJ further noted that "the claimant admitted in his sworn testimony that . . . he was better on his current medication regime; and that his only problem now was that he was not sleeping 8 hours." (R. 16H; R. 210). The ALJ also referred to plaintiff's own statement (which plaintiff's counsel asserts is not credible) to Dr. Jacobs during the consultative examination that "I can work. I just ain't got a job right now." (R. 16F; R. 106).[9] The ALJ did not, as plaintiff suggests, rely solely on plaintiff's ability to relate to his girlfriend and to father a child in finding plaintiff's testimony to be only partially credible. The other reasons cited by the ALJ for his credibility determination are adequate and supported by substantial evidence of record.

Mischaracterization of Record

Plaintiff argues that "the ALJ made multiple mischaracterizations that further taint the record, preventing the support of substantial evidence." (Plaintiff's brief, p. 15). He points to the ALJ's statements that: (1) there was no evidence that plaintiff had any inpatient admission; (2) that Dr. Strunk's assessment was exactly the same and his medications or dosages were not changed in multiple visits; and (3) that the ALJ's RFC assessment was based on the medical opinions of plaintiff's treating and examining physicians. The first statement – that there "is no evidence that the claimant had had any inpatient admission" – is on page 16F of the record. In the paragraph containing the statement to which plaintiff

[9] Plaintiff argues, "While the evidentiary record shows that is not the case, **grandiose** is a well documented symptom of Bipolar Disorder." (Doc. # 12, p. 15)(emphasis in original).

objects, the ALJ is describing Dr. Strunk's notes regarding a July 7, 2005 evaluation of the plaintiff. In those notes, Dr. Strunk indicates, "No inpatient admissions[.]" (R. 136). In support of his argument, plaintiff cites pages 138-81 of the administrative transcript, which are the records of plaintiff's inpatient admission at Southeast Alabama Medical Center in January 2007. The ALJ discusses this inpatient admission in his decision at R. 16H. Thus, it is abundantly clear that the ALJ was aware of and considered the inpatient admission and, further, that his reference to "no inpatient admissions" was not a misstatement of the record.

Plaintiff complains of the ALJ's statement that "on each of these visits [June 15, July 13 and October 12], Dr. Strunk's assessment was exactly the same and the claimant's medications or dosages were not changed." (R. 16G). This statement is fully accurate as to Dr. Strunk's assessments and as to the identity of the prescribed medications. As to the dosages, it is only partially accurate, as Dr. Strunk did increase plaintiff's Geodon on October 12, 2006. However, it appears likely that what the ALJ found remarkable was that on three consecutive visits – June 15, July 13 and August 10 – Dr. Strunk's notes regarding the treatment plan were identical. On each of these dates, Dr. Strunk noted: "Plan: Renewed Depakote 1000 mg PO QHS DC Remeron 30 mg PO QHS. Started Geodon 60 mg PO nightly." (R. 186-188). Thus, according to Dr. Strunk's notes, he discontinued Remeron and started Geodon in each of three consecutive monthly visits. The ALJ's error regarding the date of the third consecutive visit including identical language regarding the medication treatment plan does not, as plaintiff suggests, deprive the ALJ's decision of the support of substantial evidence.

Finally, plaintiff objects to the ALJ's statement that his RFC assessment was based on the "medical opinions of [Mr. Henderson's] **treating** and examining physicians[.]" (Plaintiff's brief, p. 15)(emphasis and alteration in brief). This does not appear to be a mischaracterization of the record, as plaintiff argues. The ALJ found plaintiff to suffer from the severe impairment of bipolar disorder, which is consistent with Dr. Strunk's diagnosis. The ALJ further found plaintiff to have limitations as a result of his bipolar disorder. The ALJ's failure to adopt the extreme limitations set forth on the form completed by Dr. Strunk does not demonstrate that he did not base his RFC assessment, in part, on Dr. Strunk's opinion. The plaintiff's argument regarding the ALJ's "multiple mischaracterizations" is without merit.

Step 5 Conclusion Not Supported By Substantial Evidence

Plaintiff's previous work does not qualify as "past relevant work" under the Commissioner's regulations. (R. 16B; 16K, Finding No. 8). The ALJ was required, therefore, to proceed to Step 5 of the sequential analysis. At Step 5, the Commissioner bears the burden of establishing that the plaintiff can still perform other work existing in significant numbers in the national economy. Phillips v. Barnhart, 357 F.3d 1232, 1241 n. 10 (11th Cir. 2004)(citation omitted).

The ALJ concluded that plaintiff "possesses the residual functional capacity to perform medium unskilled work activity." (R. 16K, Finding No. 7). At the hearing, a vocational expert testified regarding a significant number of jobs that could be performed by a hypothetical individual of the same age, vocational history and education level as the

plaintiff, and who can perform medium unskilled work. (R. 213-15). On further questioning by the ALJ, the VE testified that the limitations found on Exhibit 3F (the psychiatric PRTF form completed by Dr. Nuckols, the non-examining agency psychiatrist) and the "opinion found on 2F" (Dr. Jacobs' report of the consultative examination) would not preclude performance of any of the jobs she had previously listed. (R. 215).

Exhibit 2F does not include any functional limitations, but expresses Dr. Jacobs' opinion that plaintiff "is capable of employment in a wide range of jobs" and "is capable of functioning independently or managing financial resources for his own best interests." (R. 108-09). In Exhibit 3F, Dr. Nuckols concluded that plaintiff has no restrictions of activities of daily living and no episodes of decompensation of extended duration, and that he has "mild" difficulties in maintaining social functioning and in maintaining concentration persistence or pace. The ALJ found plaintiff to be more limited than did Dr. Nuckols – the ALJ rated plaintiff's functional limitations as "moderate" in the areas of social functioning and maintaining concentration, persistence or pace, and "mild" in activities of daily living. (R. 16F). Additionally, the ALJ found plaintiff to be "moderately limited in his ability to interact appropriately with supervisors and co-workers." (R. 16F). Thus, the VE's response to the ALJ's question regarding jobs available to a claimant of plaintiff's age, education, and vocational history who could perform medium, unskilled work and was further limited as expressed in Exhibits 2F and 3F does not constitute substantial evidence in support of the ALJ's Step 5 decision.

Both within the body of the decision and in his "findings," the ALJ states that plaintiff

retains the residual functional capacity for "medium unskilled work." (R. 16K, Finding No. 7; R. 16F, 16I). However, as previously noted, the ALJ also indicated in the body of the decision that plaintiff has specific functional limitations – including being moderately limited in his ability to interact appropriately with supervisors and co-workers. The Commissioner's regulations define "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a). Additionally, "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; *to respond appropriately to supervision, coworkers*, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15 (emphasis added). To the extent that the ALJ decided that limiting plaintiff to "unskilled work" is adequate to encompass his mental limitations, he erred. See Millhouse v. Astrue, 2009 WL 763740 (M.D. Fla. Mar. 23, 2009)(concluding that "a finding of a restriction to unskilled work does not sufficiently encompass the moderate limitations of social functioning and concentration, persistence, or pace"); Singleton v. Astrue, 2008 WL 897511 (M.D. Fla. Mar. 31, 2008)(rejecting Commissioner's argument that limiting the claimant to unskilled work – where the claimant was found to have "moderate difficulties in maintaining concentration, persistence or pace" – reflected adequate consideration of the impact of her mental impairment on her ability to meet the mental demands of work); cf. Vuxta v. Commissioner of Social Security, 194 Fed. Appx. 874 (11th Cir. 2006)(noting, in the context of reviewing the ALJ's reliance on the "grids," that "a limitation to simple tasks is already contained

within the unskilled limitation, and is not a limitation above and beyond that classification" but that "[a] limitation to repetitive tasks, however, is not contained within the definition of unskilled."). Since a limitation to unskilled work does not adequately encompass plaintiff's moderate limitation in his ability to interact appropriately with supervisors and co-workers, the VE's response to the ALJ's question regarding jobs available for a claimant who could perform medium unskilled work does not provide substantial evidence in support of the ALJ's Step 5 conclusion.[10]

**CONCLUSION**

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is not supported by substantial evidence at Step 5 of the analysis and, accordingly, that the decision is due to be reversed and remanded to the Commissioner for further proceedings.[11] A separate judgment will be entered.

Done, this 28th day of August, 2009.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

[10] Because the evidentiary record and the findings of the ALJ would not permit reliance on the grids, the court cannot conclude that the ALJ's Step 5 error is harmless.

[11] The court does not intend to suggest that it believes plaintiff to be entitled to benefits. A properly framed hypothetical posed to the vocational expert would likely have elicited testimony providing substantial support for the ALJ's conclusion at Step 5 and his ultimate conclusion that plaintiff is not disabled.